Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Kyle P. Quackenbush (State Bar No.322401)
Anupama K. Reddy (State Bar No. 324873)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:  (415) 500-6800
Facsimile:   (415) 395-9940
Email: jsaveri@saverilawfirm.com
        swilliams@saverilawfirm.com
        kquackenbush@saverilawfirm.com
        areddy@saverilawfirm.com

*Attorneys for Individual and Representative Plaintiffs
Denise Redfield and Albert Riccelli*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DENISE REDFIELD and ALBERT RICCELLI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALTRIA GROUP, INC., and JUUL LABS, INC.,<br><br>Defendants. | Case No.<br><br>**ANTITRUST CLASS ACTION COMPLAINT FOR (1) UNLAWFUL RESTRAINT OF TRADE, 15 U.S.C. § 1; (2) UNLAWFUL MERGER AND ACQUISITION, 15 U.S.C. § 7; AND (3) INJUNCTIVE RELIEF, 15 U.S.C. § 26**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Denise Redfield and Albert Riccelli (collectively "Plaintiffs") on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants Altria Group, Inc. and Juul Labs, Inc., for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 7 of the Clayton Act, 15 U.S.C. § 18, as follows:

**INTRODUCTION**

1.      This is an antitrust class action against Defendants Altria Group, Inc. ("Altria") and Juul Labs, Inc. ("Juul"), concerning anticompetitive agreements between them in which Altria agreed to refrain from competing against Juul in the United States market for closed-system electronic cigarettes ("e-cigarettes") in return for a substantial ownership interest in Juul. By these agreements, Altria and Juul agreed to divide and allocate the market for e-cigarettes. By this lawsuit, Plaintiffs seek damages and injunctive relief for the collusive and concerted restraint in trade orchestrated by Defendants.

2.      E-cigarettes are electronic devices that deliver nicotine to a user by vaporizing a liquid nicotine solution. In a closed system, the liquid is contained in a pre-filled, sealed cartridge or pod. Juul was and is the dominant player in the sale of closed-system e-cigarettes in the United States.

3.      In light of declining sales in the market for traditional cigarettes and a shift by consumers to alternative nicotine delivery devices, Altria viewed participation in the e-cigarette market as essential to its long-term survival. In 2013, Altria entered the market through its subsidiary Nu Mark LLC. Its flagship product was the MarkTen e-cigarette.

4.      In 2015, Juul entered the market and quickly captured substantial market share. By 2018, Juul had obtained market share of over 70 percent, stunning Altria and other competitors. Juul's swift rise posed a grave competitive threat to Altria in both the e-cigarette and traditional cigarette markets. To eliminate that threat, Altria began a two-prong strategy of acquiring Juul, while continuing to compete against it. Its efforts to acquire Juul were unsuccessful initially.

5.      With respect to competition, Altria introduced a new product known as the MarkTen Elite, which closely resembled Juul's product. With respect to acquisition, Altria entered into negotiations to acquire an ownership interest in Juul. Initially, Juul refused to

- 1 -

negotiate. But in the fall of 2018, Juul agreed to negotiate with Altria, under the condition that Altria stop competing with Juul in the market for e-cigarettes. In particular, Juul refused to proceed with negotiations unless and until Altria had withdrawn its products. At first, Altria refused. In October 2018, however, Altria agreed and began to withdraw its e-cigarette products from the market.

6.    Two months later in December of 2018, Altria announced its intention to cease competing entirely in the relevant market. Approximately two weeks after making this announcement, Altria disclosed that, on October 20, 2018, it had entered into certain agreements with Juul. Among other things, the agreements provided that Altria would acquire certain ownership interests in Juul and other rights, in exchange for over $12 billion in cash and agreement by Altria to withdraw from and exit the e-cigarette market.

7.    The agreements between Altria and Juul whereby Altria and Juul agreed to allocate the market for e-cigarettes were anticompetitive. Defendants' conduct has illegally restrained competition in the relevant market in violation of the Sherman and Clayton Acts. As a direct and proximate result of Defendants' anticompetitive conduct, prices for e-cigarettes were raised, fixed and stabilized at supracompetitive levels. Altria's investment in Juul and its exit from the market eliminated its existing e-cigarette product and halted its ongoing innovation efforts toward developing new and improved products. Thus, consumers lost the benefit of current and future head-to-head competition between Altria and Juul, and between Altria and other competitors.

## JURISDICTION AND VENUE

8.    Plaintiffs bring this action on their own behalf as well as that of the Class to recover damages, including treble damages, costs of suit, and reasonable attorney's fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 7 of the Clayton Act, as well as any and all equitable relief afforded them under the federal laws pleaded herein.

9.    Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the

affected interstate trade and commerce was carried out in this District, and one of more of the Defendants reside in this District or is licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## INTRADISTRICT ASSIGNMENT

10.     Pursuant to Civil Local Rule 3.2(c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws action was substantially conducted with, directed to, or impacted Plaintiffs and members of the Class in counties located within the Division.

## PARTIES

11.     Plaintiff Denise Redfield is a resident of the State of Pennsylvania. Ms. Redfield purchased Juul products directly from Juul during the relevant period. Plaintiff Redfield was injured in connection with her purchases during the Class Period as a result of Defendants' anticompetitive and unlawful agreements alleged herein.

12.     Plaintiff Albert Riccelli is a resident of the Commonwealth of Pennsylvania. Mr. Riccelli purchased Juul products directly from Juul during the relevant period. Plaintiff Riccelli was injured in conjunction with his purchases during the Class Period as a result of Defendants' anticompetitive and unlawful agreements alleged herein.

13.     Defendant Juul Labs, Inc. ("Juul"), is a Delaware corporation with its principal place of business located at 560 20th Street, San Francisco, California. Juul is the leading manufacturer of closed-system e-cigarettes, generating over $1 billion in sales in 2018. During the Class Period, Juul sold e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States. Juul is a party to the anticompetitive and unlawful agreements alleged herein.

14.     Defendant Altria Group, Inc. ("Altria") is a Virginia corporation headquartered at 6601 West Broad Street, Richmond, Virginia. Altria is one of the country's largest tobacco companies and was, prior to the anticompetitive agreements alleged, a manufacturer of closed-system e-cigarettes. During the Class Period, Altria sold e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States. Altria is a party to the anticompetitive and unlawful agreements alleged herein. Prior to those anticompetitive and illegal agreements, Altria sold and marketed e-cigarettes under the brand names MarkTen and Green Smoke. In 2018, Altria generated over $25 billion in sales.

## AGENTS AND CO-CONSPIRATORS

15.     The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

16.     Defendants' agents operated under the authority and apparent authority of their principals.

17.     Defendants, through their subsidiaries, affiliates and agents operated as a single unified entity.

18.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

19.     Each Defendant acted as the principal, agent or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

CLASS ACTION COMPLAINT AND JURY DEMAND

**CLASS ALLEGATIONS**

20.    Plaintiffs bring this action for damages and injunctive relief on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure, 23(a), (b)(2) and (b)(3), on behalf of a similarly situated Class, which is defined, as follows:

> All persons or entities in the United States that purchased e-cigarettes directly from Juul from December 7, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

This definition specifically excludes the following persons or entities:

      a.    Any of the Defendants named herein;

      b.    Any of the Defendants' co-conspirators;

      c.    Any of Defendants' parent companies, subsidiaries, and affiliates;

      d.    Any of Defendants; officers, directors, management, employees, subsidiaries, affiliates or agents;

      e.    All governmental entities; and

      f.    The judges and chambers staff in this case, as well as any members of their immediate families.

21.    Plaintiffs do not know the exact number of Class members, because such information is in the exclusive control of Defendants. Plaintiffs are informed and believe that, due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

22.    Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs directly purchased a JUUL device from Juul, Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

23.    Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a. Whether Defendants combined or conspired with one another to fix, raise, maintain or stabilize prices for e-cigarettes sold at any time during the Class Period to purchasers in the United States;

b. Whether Defendants combined or conspired with one another to divide or allocate the market for e-cigarettes sold at any time during the Class Period to purchasers in the United States;

c. Whether Defendants had market power with respect to the relevant market;

d. The definition of the relevant product market;

e. The definition of the relevant geographic market;

f. Whether Defendants' conduct caused the prices of e-cigarettes sold at any time during the Class Period to purchasers in the United States to be artificially fixed, raised, maintained or stabilized at supracompetitive prices or price levels;

g. Whether Plaintiffs and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages;

h. Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

24.     These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

25.     Plaintiffs will fairly and adequately represent the interests of the Class because they directly purchased e-cigarettes from one or more Defendants and they have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation.

26.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

27.     This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

28.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FACTUAL ALLEGATIONS

**Industry Background**

29.     The discovery of the negative impacts of tobacco use in the 1990's and early 2000's changed American society. Laws were enacted banning cigarette smoking in public places such as restaurants and bars. The prohibition sparked changes in Americans' smoking habits and added to increasing social stigma. Dramatically increased taxes provided another disincentive, and many Americans gave up smoking to live a healthier life. Rates of traditional smoking among the younger generations decreased drastically.

30.     The first modern electronic cigarettes appeared in the U.S. market by the mid-2000s. Around 2010, traditional tobacco companies started either entering the market with their own products or acquiring existing e-cigarette companies.

31.     Altria entered the market with its MarkTen e-cigarette in 2013, and over the next several years spent well over $100 million acquiring other existing e-cigarette platforms in order to augment its portfolio.

32.     Juul was spun out of Pax Labs ("Pax"), a San Francisco-based maker of vaporizers, in 2017. Started in 2007 by James Monsees and Adam Bowen, graduates of the design program at Stanford University, Pax was earlier called Ploom. Bowen left Pax in June 2011. Monsees left Pax in July 2017. Bharat Vasan served as CEO from February 2018 until September 2019.

33.     Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product." Because of "some problems" inherent in the cigarette, Juul's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco

category." Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products." With a focus on recreating the "ritual and elegance that smoking once exemplified," Monsees and Bowen founded Pax to "meet the needs of people who want to enjoy tobacco but don't self-identify with – or don't necessarily want to be associated with – cigarettes."

34.    In 2015, Pax launched the Juul e-cigarette, a closed-system in a discreet "pod-based" format. The device deployed a chemical breakthrough in the speed of its nicotine delivery. Since the 1960s, tobacco companies have manufactured cigarettes that freebase nicotine using ammonia, which liberates the nicotine so that it can be quickly absorbed into the lungs and the brain. As one addiction expert has said, "[t]he modern cigarette does to nicotine what crack does to cocaine." Pax discovered that by adding benzoic acid to nicotine salts, which occur naturally in tobacco, they could mimic a cigarette's rapid nicotine delivery.

35.    JUUL, the product, was introduced in 2015. JUUL uses a proprietary blend of nicotine developed by Juul. According to Bowen, because it contains ten times as much nicotine as other e-cigarettes, JUUL packs a "bigger punch" as compared to other, similar products in the market. Bowen also stated that the idea behind the blend was to eliminate the need for smokers to go back to cigarettes after an unsatisfying experience with vaping.

36.    Each JUUL pod is a plastic enclosure containing 0.7 milliliters of Juul's patented nicotine liquid and a coil heater. When a sensor in the JUUL device detects the movement of air caused by suction on the JUUL pod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUUL pod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a battery level indicator and lights up in a "party mode" display of a rainbow of colors when the device is waved around.

37.    The physical design of the JUUL device (including its circuit board) and JUUL pod determines the amount of aerosolized nicotine the JUUL device emits. By altering the temperature, maximum puff duration, or airflow, among other things, Juul can finely tune the amount of nicotine vapor the JUUL device delivers.

38.    Juul's product quickly gained traction among consumers, rapidly surpassing Altria and securing the largest share of the closed-system e-cigarette market.

39.    Since its launch in 2015, Juul has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700% in 2017. According to a recent Wells Fargo report, Juul controlled 75% of the U.S. market for e-cigarettes by the end of 2018.

40.    In July 2017, Juul labs was spun out of PAX Labs as an independent company, with Tyler Goldman, former CEO of PAX Labs, named as CEO of Juul. In December 2017, Goldman was replaced by Kevin Burns. Monsees worked as Chief Product Officer and board member at Juul. Bowen worked as Chief Technology Officer and board member at Juul.

**Defendants Entered into Illegal and Anticompetitive Agreements to Divide and Allocate Markets and not to Compete**

41.    Despite becoming the dominant market leader, Juul was concerned that its competitor, Altria, would use its company's success, rich history, and experience in the tobacco business and abundant human and capital resources to compete with respect to product innovation and price.

42.    Consistent with these concerns, Altria began a strategy of attempting to acquire Juul while simultaneously competing aggressively against it. Initially, Juul rebuffed these efforts and sought to compete with respect to its e-cigarettes, particularly with respect to price.

43.    In the Summer of 2018, Juul sought to reach illegal and anticompetitive agreements to divide and allocate the market for e-cigarettes and not to compete.

44.    Among other things, Juul sought to obtain Altria's agreement, in exchange for valuable consideration, to control or allocate the market for e-cigarettes. In particular, Juul sought Altria's agreement that Altria withdraw its products from the e-cigarette market.

45.    On July 30, 2018, in advance of a meeting between Juul's lead negotiators, Nick Pritzker, a Juul Board member, emailed Howard Willard, Altria's CEO, an opening term sheet for discussions. The term sheet included a non-compete term which provided that Altria withdraw from the e-cigarette market.

46.     On August 1, 2018, the negotiators met at the Park Hyatt Hotel in Washington, DC to discuss terms. The attendees of this meeting consisted of the lead negotiators for each side: Nick Pritzker and Riaz Valani, two members of Juul's Board of Directors, Kevin Burns, Juul's then Chief Executive Officer, Howard Willard, Altria's Chief Executive Officer, and Billy Gifford, Altria's Chief Financial Officer. The participants discussed various business terms, including anticompetitive agreements not to compete. After this meeting, Altria's top executives understood that ceasing to compete in the e-cigarette business would be a condition for reaching a deal with Juul.

47.     When Altria sought to modify Juul's proposed non-compete term, Juul responded negatively and reiterated its demands. On August 9, 2018, Billy Gifford sent over a markup of the term sheet to Nick Pritzker, Riaz Valani, and Kevin Burns.

48.     On October 5, 2018, Altria's Howard Willard sent Nick Pritzker, Riaz Valani, and Kevin Burns a letter assuring them that Altria would accede to the non-compete terms and that Altria was prepare to agree to exit the market. The concessions contained in this letter helped to restart the stalled negotiations. Soon after, Altria began to take key steps that would facilitate a possible wind down of the Nu Mark business and exit from competition in the e-cigarette market.

49.     On October 25, 2018, Altria announced that it was temporarily halting its MarkTen Elite business, ostensibly out of concern that pod-based systems and nontraditional flavors could be contributing to youth usage. Pursuant to such agreement, in October 2018, Altria began removing its e-cigarettes from the market.

50.     A few days later, Altria and Juul, which was the largest seller of a pod-based system using non-traditional flavors, agreed to basic deal terms, which included Altria not competing in the e-cigarette market.

51.     On December 7, 2018, after five years of continuous participation in the e-cigarette market, Altria announced its decision to wind down its remaining e-cigarette business, including its MarkTen cig-a-like.

52.     On December 9, 2018, Murray Garrick, Altria's General Counsel, emailed Jerry Masoudi, Chief Legal Officer at Juul, to discuss the deal.

53.     On December 20, 2018, less than two weeks after Altria announced its decision to discontinue its e-cigarette operations, Juul and Altria subsequently executed certain agreements providing that Altria pay 12.8 billion in cash in exchange for newly issued Juul stock amounting to a 35% ownership interest in Juul.

54.     On December 20, 2018, Juul and Altria executed a series of agreements. Pursuant to the Purchase Agreement, Altria purchased for $12.8 billion in cash, a 35% non-voting stake in Juul. The agreement was not submitted to the Department of Justice or the Federal Trade Commission on the grounds that the Hart-Scott-Rodino Act did not require notification. The agreement valued Juul at roughly $38 billion, more than double Juul's reported value less than seven months earlier, demonstrating Juul's competitive success.

55.     By its terms, the Purchase Agreement incorporates various ancillary agreements, including: (a) a Relationship Agreement; (b) a Services Agreement; (c) a Voting Agreement; and (d) an Intellectual Property License Agreement.

56.     The Relationship Agreement provides, among other things, that Altria and Juul would not compete with one another. In particular, the Relationship Agreement contains a "Non-Compete" provision, which provides, in pertinent part that:

> [Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist other in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . . Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued . . . .

In so doing, Altria agreed to withdraw from the e-cigarette market, allocating it exclusively to Juul.

57.     The Services Agreement provided, among other things, that Altria would provide certain services to Juul. In particular, Altria agreed to lease convenience store shelf space to Juul. Altria also agreed to provide certain regulatory consulting, and distribution support. Altria also agreed to provide direct marketing support and sales services.

58.     Under the terms of the Relationship Agreement, the Non-Compete went into effect early in 2019. The Services Agreement had an initial six-year term, subject to early termination by mutual consent or in case of material breach, bankruptcy, or insolvency. If the Services Agreement were to expire, Altria could discontinue the Non-Compete agreement, described above, at which point it would lose its right to appoint members to Juul's Board of Directors and its pre-emptive right to maintain its 35% stake in the company, but would regain its ability to compete in the market against Juul. As described below, the Services Agreement was subsequently amended.

59.     Under the Intellectual Property License Agreement, Altria granted Juul a non-exclusive irrevocable license to Altria's e-cigarette intellectual property.

60.     The Voting Agreement provided, among other things that Altria would obtain seats on Juul's Board of Directors following conversion of its shares.

61.     On February 14, 2019, Respondents filed for Hart-Scott-Rodino clearance to convert Altria's interest into voting securities (the "Antitrust Conversion") and to grant Altria permission to appoint three (of nine) members of Juul's Board of Directors, as provided by the Voting Agreement.

62.     On January 30, 2020, Juul and Altria announced amendments to their agreement, including an Amended Purchase Agreement, an Amended Relationship Agreement, an Amended Services Agreement, and a Revised Voting Agreement.

63.     Under the Revised Voting Agreement, after the Antitrust Conversion, Altria will instead have the right to: (i) appoint two (of nine) Juul directors; (ii) nominate one (of three) Juul independent directors; (iii) appoint one (of four) members of a Nominating Committee (who would have the right to veto independent director nominations); (iv) appoint two (of five) members and the chair of a new Litigation Oversight Committee (which would have responsibility

for managing litigation involving both Altria and Juul, i.e., "Joint Litigation Matters"); and (v) appoint one (of three) members of a Litigation Subcommittee (which would have authority, by unanimous vote, to change Juul's senior outside counsel responsible for Joint Litigation Matters). The Revised Voting Agreement also granted Juul's CEO: (i) a board seat; (ii) a seat on the Litigation Oversight Committee; and (iii) a seat on the Litigation Subcommittee.

64.    The Amended Relationship Agreement gives Altria the option to be released from the Non-Compete if Juul is prohibited by federal law from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial value of $12.8 billion.

65.    The Amended Services Agreement eliminates all services except for regulator support services. The amendment was effective at signing except with regard to Altria's provision of retail shelf space to Juul, which service was set to expire after March 31, 2020. The transaction eliminated a threat to Juul's market dominance and required Altria to dedicate its vast resources, including distribution and shelf-space, to ensure Juul's continued market dominance.

66.    After executing the transaction, Altria appointed its Chief Growth Officer as its observer on the Juul Board of Directors. Following the executive's departure from Altria to become Chief Executive Officer of Juul, Altria appointed its Chief Financial Officer and Vice Chairman to fill the observer position.

67.    The Transaction's anticompetitive effects were particularly clear in the market for closed-system e-cigarettes given high barriers to entry, such as U.S. Food & Drug Administration ("FDA") approval. Repositioning new products in the market was also unavailing to counter the anticompetitive impact of the Transaction. Defendants cannot show the transaction restricting competition resulted in cognizable efficiencies sufficient to outweigh the competitive harm caused by Altria's agreement to exit the relevant market. Nor can Defendants point to pro-competitive benefits that could not have been achieved through less restrictive means. In fact, much of the Defendants' collaboration was restructured in January 2020 to eliminate its marketing aspects, further reducing the scope of theoretical benefits from their agreements.

**The FTC Action**

68.     On April 1, 2020, the Federal Trade Commission ("FTC") filed a complaint against Altria and Juul under Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), alleging the Transaction violated Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18.

69.     The FTC alleged that the Defendants' conduct unreasonably restrained competition, and that the Transaction substantially lessened competition in the U.S. market for closed-system e-cigarettes by eliminating competition between Altria and Juul on price, innovation, promotional activity, and shelf space.

## MARKET STRUCTURE

**Market Concentration**

70.     At the time of Altria's exit, the relevant market was already highly concentrated. Following Altria's exit, it became even more concentrated.

71.     The federal antitrust agencies, consistent with the Merger Guidelines and federal court decisions, measure concentration using the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by totaling the squares of the market shares of each firm in the relevant market. Under the Merger Guidelines, a merger is presumed likely to create or enhance market power— and is presumably illegal—when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

72.     In the U.S. market for closed-system e-cigarettes, the Transaction resulted in a post-Transaction HHI exceeding 2,500, with an increase in HHI of more than 200. Thus, the Transaction resulted in concentration that establishes a presumption of competitive harm in the relevant market.

**Relevant Market**

73.     The relevant product market for the purposes of this action is the closed-system e-cigarette market.

74.     E-cigarettes are battery-powered devices that vaporize a liquid solution containing nicotine (an "e-liquid"). There are two broad categories of e-cigarettes; closed-system and open-tank. Closed-system e-cigarettes consist of a device housing a battery and a heating mechanism, and sealed cartridges or pods that are pre-filled with e-liquid. Examples of closed-system devices include cigalikes, which are similar to traditional cigarettes in size and shape, and pod-based products, such as Juul or MarkTen Elite, which look like USB drives. Subsequent to an FDA flavor ban that went into effect February 2020, closed-system pods and cartridges are available only in tobacco and menthol flavors.

75.     By contrast, open-tank e-cigarettes incorporate refillable tanks that customers manually fill with e-liquid. Because customers can select from (and mix together) a wide assortment of e-liquids, open-tank e-cigarettes allow a more customizable experience whereby users can experiment with different flavors and nicotine strengths. In addition, unlike with closed systems, users can customize the individual components of an open-tank system, such as the battery, heating coil, and atomizer (which houses the heating coil).

76.     Closed-system e-cigarettes are largely sold in different channels than open-tank products. Most closed-system e-cigarettes are sold through a multi-outlet channel, which consists primarily of convenience stores. Convenience stores offer a limited range of e-cigarette products, focusing on the highest-volume brands. In contrast, open-tank e-cigarettes are sold almost exclusively at dedicated vape shops, retail outlets that typically carry an extensive selection of e-liquids and parts for open-tank products and offer a high level of customer service.

77.     Defendants considered their respective Juul and MarkTen product lines to be direct competitors with each other and with other closed-system e-cigarette products and set prices based on competition with each other and with other closed-system products. Defendants further acknowledged that their closed-system e-cigarette products did not compete as closely with open-tank products.

78.     There are no reasonable substitutes for closed-system e-cigarettes. Closed-system e-cigarettes appeal to consumers because they are discreet due to their small size, and convenient due to their self-contained, ready-to-use format. Open-tank e-cigarettes are not an adequate

substitute for closed-system e-cigarettes because they are larger, more complex, and require more manual operation by the user. Open-tank e-cigarettes generally appeal to a different user type, one that appreciates their complexity and customizable nature.

79.    A hypothetical monopolist in the closed-system e-cigarette market would find it profitable to impose at least a small but significant and non-transitory increase in price.

80.    The relevant geographic market is no broader than the United States. Because of the FDA's requirements (described below), foreign firms cannot import e-cigarettes into the United States without prior FDA approval.

81.    According to Nielson data, retail sales of closed-system e-cigarettes in the United States in 2018 constituted approximately $2.8 billion.

**The E-Cigarette Market Has High Barriers to Entry**

82.    Under the FDA regulatory framework, a manufacturer of a new tobacco product, including an e-cigarette, must submit to the FDA a Premarket Tobacco Product Application ("PMTA") and receive the FDA's approval before marketing that product. An e-cigarette that was on the market prior to August 8, 2016 may remain on the market, but the manufacturer of that product must file a PMTA by May 12, 2020 to continue marketing it and must remove the product in the event the PMTA is denied. An e-cigarette that was not on the market prior to August 8, 2016 cannot be marketed until it receives PMTA approval. At the time Defendants executed the Transaction, the deadline for an in-market applicant to file its PMTA was August 8, 2022.

83.    Preparing a PMTA requires a significant amount of resources—time, personnel, and money, which can range from several hundreds of thousands to multiple millions of dollars per product.

84.    The FDA announced on January 2, 2020 that it had finalized a new enforcement policy prohibiting all non-tobacco/non-menthol flavors for cartridge-based e-cigarettes until a PMTA authorization, which went into effect on February 6, 2020.

85.    Throughout the Class Period, Juul dominated the relevant market and maintained power to control prices and exclude competition in that market.

86.     According to a Wells Fargo report on the tobacco industry based on Nielson scanner data, Juul had amassed a 72 percent market share by August of 2018. Altria's market share at that time was 8 percent.

87.     Altria began pulling its products off the market in October 2018. By November, Altria's market share had fallen to 4 percent, and Juul's had grown to over 75 percent.

88.     By December 2018, Altria had pulled its products off the market entirely. The Transaction not only eliminated one of Juul's most successful competitors, it gave Juul access to Altria's vast resources and capital.

89.     The Transaction was intended to, and did, significantly increase Juul's monopoly power in the relevant market.

**ANTICOMPETITIVE EFFECTS OUTWEIGH PROCOMPETITIVE BENEFITS, IF ANY**
   **Anticompetitive Effects**

90.     Defendants' illegal agreements had the purpose and effect of raising prices, reducing output, reducing innovation and eliminating consumer choice.

91.     The purpose and effect of the illegal agreements was for Altria to withdraw from current and future competition in exchange for a share of the monopoly prices Juul was able to charge, and would be able to charge, due to its dominant position.

92.     The transaction also closed routes to other potential acquisitions or partnerships through which Altria might have participated in the relevant market.

93.     Juul's conduct as alleged herein had the purpose, capacity, tendency, and effect of restraining competition unreasonably, and the transaction substantially lessened competition, in the U.S. market for closed-system e-cigarettes, in the following ways, among others:

   a.   Eliminating Altria's competing products from the relevant market, including promotional activity to create awareness and drive sales, thereby eliminating current and future price competition between Juul and Altria;

   b.   Eliminating current and future innovation competition between Juul and Altria; and

> c. Eliminating current and future competition between Juul and Altria for shelf space at retailers through rebates and other incentives.

94.     Altria's agreement to exit the relevant market eliminated one of Juul's most dangerous rivals. As a large, well-established, and well-funded company with longstanding relationships and significant shelf space with retailers nationwide, Altria had the resources and infrastructure to drive sales and compete aggressively.

95.     Altria leveraged its ownership of leading brands across multiple tobacco categories in order to secure substantial and favorable shelf space at retailers throughout the United States. In 2018, for example, to Juul's alarm, Altria launched a major campaign to secure shelf space for its innovative tobacco products (including e-cigarettes), offering retailers product discounts, slotting fees, and fixture payments. After the Transaction, instead of competing for shelf space, Altria leased its shelf space to Juul, effectively replacing its own MarkTen products with Juul's product.

96.     Before the shut-down of Nu Mark, Juul and Altria relied on price promotions to drive sales of their respective e-cigarette products. In addition, each monitored the other's pricing in setting its own strategy. Altria's decision to pull its MarkTen products brought this price competition to an end.

97.     In addition to price competition, Juul and Altria competed through product innovation, including device features and e-liquid formulations. For example, it was Juul's success that prompted Altria to acquire and further develop various pod-based e-cigarettes (including Elite), and to commit significant resources toward developing e-liquid formulations with nicotine slats and higher nicotine concentrations.

98.     Based upon documents submitted to the Federal Trade Commission from Defendants, it appears that before committing to the transaction, Altria intended to compete over the long term. Altria's documents and executive statements repeatedly evince their recognition that e-cigarettes were the future of the tobacco industry and their absolute commitment to participate in that future. For example:

a. Mr. Martin Barrington, Altria's former CEO, stated to investors: "So we'll be clear: We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products."[1]

b. Mr. Howard Willard, Altria's current CEO, in an interview with the Wall Street Journal, stated: "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."[2]

99.    Instead of continuing to pursue its ambitions in the relevant market through competition, including aggressive price promotions, product development, and incentives for shelf space, Altria sought a short cut to market leadership by investing in its competitor. Altria agreed to abandon its long-standing and significant efforts at current and future competition in exchange for a significant share of Juul's profits resulting from a significantly less competitive marketplace.

**Lack of Procompetitive Benefits**

100.    Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the presumption that the conduct alleged substantially lessened competition in the relevant market. Defendants cannot demonstrate pro-competitive benefits of the conduct alleged that could not have been achieved through alternative means that would have been less restrictive on competition than the conduct alleged.

101.    Defendants cannot demonstrate that entry into the relevant market by new competitors or expansion by existing competitors would be timely, likely, or sufficient to offset the anticompetitive effects of the conduct alleged.

---

[1] Martin Barrington, CEO, Altria Group, Inc., Address at the Consumer Analyst Group of New York Conference (Feb. 21, 2018), https://www.sec.gov/Archives/edgar/data/764180/000076418017000131/exhibit991-2017investorday.htm.

[2] Jennifer Maloney and Dana Mattioli, *Why Marlboro Maker Bet on Juul, the Vaping Upstart Aiming to Kill Cigarettes,* Wall St. J. (Mar. 23, 2019), https://www.wsj.com/articles/why-marlboro-maker-bet-on-juul-the-vaping-upstart-aiming-to-kill-cigarettes-11553313678.

102.    The entry of new competitors into the relevant market is unlikely because the regulatory approval process is exceptionally time-consuming and expensive. Defendants themselves estimate that preparing a PMTA for an e-cigarette would require substantial time and investment.

103.    In addition to achieving regulatory approval, a new entrant would need to: (i) develop or acquire a product; (ii) manufacture the product at quality and scale; (iii) sell the product; (iv) develop a distribution system; and (v) develop a marketing plan, including a plan to secure shelf space in retail outlets.

104.    Existing closed-system e-cigarette competitors cannot effectively replace the lost competition because: (i) they lack Altria's brand strength to secure favorable shelf space at retailers; (ii) they lack the substantial resources Altria had at its disposal to commit to e-cigarette research and development as well as to pursuing regulatory approval; and/or (iii) the FDA's enforcement of restrictions on e-liquid flavors has negatively impacted the competitive presence of closed-system competitors other than Juul, who had voluntarily discontinued its flavors earlier.

105.    Open-tank e-cigarette manufacturers are not likely to replace the lost competition, in part because the impending PMTA deadline will likely cause many of them to shut down, and because they are largely sold in the separate "vape shop" sales channel and would not likely be able to expand rapidly into convenience stores, where closed-system e-cigarettes are typically sold.

106.    Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the presumption that the transaction substantially lessened competition in the relevant market. Defendants cannot demonstrate pro-competitive benefits of the conduct alleged that could not have been achieved through alternative, less restrictive means.

107.    Defendants' unlawful conduct eliminated competition in the relevant market and deprived Plaintiffs and the Class of the benefits of free and unrestrained competition that the antitrust laws were designed to ensure.

**DEFENDANTS' ANTICOMPETITIVE AGREEMENT AND INJURY TO PLAINTIFF AND THE CLASS**

108.    Defendants' combination and conspiracy as set forth herein has had the following effects, among others:

  a.  Price competition among Defendants in the sale, marketing and distribution of e-cigarettes during the Class Period to purchasers in the United States has been restrained;

  b.  Prices for e-cigarettes sold by Defendants during the Class Period to purchasers in the United States have been raised, fixed, maintained, and stabilized at artificial and non-competitive levels; and

  c.  The supplies of Defendants' e-cigarettes available for sale during the Class Period to purchasers in the United States has been artificially and unjustifiably restrained.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**

**(Against all Defendants)**

109.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraphs as though fully set forth herein.

110.    Defendants entered into and engaged in a continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 by artificially reducing or eliminating competition with respect to the sale, marketing and distribution of e-cigarettes sold to purchasers in the United States.

111.    In particular, Defendants have combined and conspired to divide and allocate the market for e-cigarettes to raise, fix, maintain or stabilize the prices of e-cigarettes sold purchasers in the United States.

112.    The aforesaid violations of Section 1 consisted of an unlawful agreement in which Juul required Altria to withdraw from the relevant market and in exchange gave Altria an interest in Juul's continuing business in the relevant market from which Altria withdrew. The purpose of this agreement was to fix, raise, maintain or stabilize prices of closed system e-cigarettes products in the relevant market as well as stifle innovation.

113.    As a result of Defendants' unlawful conduct and acts taken in furtherance of their conspiracy, Altria removed competing products from the relevant market, thereby eliminating current and future price competition between Juul and Altria, in particular promotional activity to create awareness and drive sales. Further, the unlawful conduct had the purpose and effect of eliminating current and future innovation competition between Juul and Altria; and eliminating current and future competition between Juul and Altria for shelf space at retailers through rebates and other incentives.

114.    For the purposes of formulating and effectuating their combination or conspiracy, Defendants did those thing they combined or conspired to do, including (1) participating in meetings and conversations to eliminate competition from the market and (2) agreeing to allocate or divide the market for e-cigarettes between them.

115.    Defendants' anticompetitive and unlawful conduct is per se illegal.

116.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and class members were injured in their business or property.

**COUNT TWO**

**RESTRAINT OF TRADE IN VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18**

**(Against all Defendants)**

117.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraphs as though fully set forth herein.

118.    The agreements, as described above, in which Altria received a substantial ownership stake in Juul and for the purposes of which Altria withdrew its existing e-cigarettes

from the market and halted its innovation on future products, substantially lessened competition in the market for closed system e-cigarettes in the United States.

119.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and class members were injured in their business or property.

**COUNT THREE**

**DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT AND SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 26**

**(Against all Defendants)**

120.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

121.    Plaintiffs seeks declaratory and injunctive relief under the federal antitrust laws.

122.    Plaintiffs' allegations described herein constitute violations of Section 1 of the Sherman Act.

123.    Defendants effectuated a scheme to restrain trade and substantially lessen competition in the U.S. market for closed system e-cigarettes.

124.    There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' conduct that outweighs its harmful effect.

125.    As a direct and proximate result of Defendants' anticompetitive scheme, as alleged herein, Plaintiffs and the Class were harmed as aforesaid.

126.    The goal, purpose and/or effect of the scheme was to prevent and/or delay competition to continue charging supracompetitive prices for e-cigarettes without a substantial loss of sales.

127.    The anticompetitive agreements alleged herein should be declared invalid and unenforceable.

128.    Plaintiffs and the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count. Their injury consists of paying higher prices for e-cigarettes than they would have paid in the absence of those violations. These injuries will continue unless halted.

129.    Plaintiffs and the Class, pursuant to Fed.R.Civ.P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of § 1 of the Sherman Act.

130.    Plaintiffs and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

1.    This action may proceed as a class action, with Plaintiffs serving as the Class Representatives and with Plaintiffs' counsel as Class Counsel;

2.    Defendants have combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

3.    Defendants have combined in a way that substantially lessened competition or tended to create a monopoly in the market for closed system e-cigarettes in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

4.    Plaintiffs and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section  of the Clayton Act, 15 U.S.C. § 15 and Section 7 of the Clayton Act, 15 U.S.C. § 18;

5.    Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

6.    Plaintiffs and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

a.    A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendants;

b.    Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements alleged herein; and

c.    Divestiture of Altria's equity stake in Juul and rescission of Altria's purchase of that stake.

7.    Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

8.    Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

9.    Plaintiffs and the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims asserted in this Complaint so triable.

1

2     Dated: May 14, 2020                    JOSEPH SAVERI LAW FIRM, INC.

3                                            _____/s/ Joseph R. Saveri_____
                                                   Joseph R. Saveri
4
                                            Joseph R. Saveri (State Bar No. 130064)
5                                           Steven N. Williams (State Bar No. 175489)
                                            Kyle P. Quackenbush (State Bar No.322401)
6                                           Anupama K. Reddy (State Bar No. 324873)
                                            **JOSEPH SAVERI LAW FIRM, INC.**
7                                           601 California Street, Suite 1000
                                            San Francisco, California 94108
8                                           Telephone:  (415) 500-6800
                                            Facsimile:   (415) 395-9940
9                                           Email:  jsaveri@saverilawfirm.com
                                                      swilliams@saverilawfirm.com
10                                                    kquackenbush@saverilawfirm.com
                                                      areddy@saverilawfirm.com
11
                                            Marc H. Edelson (*pro hac vice* forthcoming)
12                                          **EDELSON LECHTZIN LLP**
                                            3 Terry Drive, Suite 205
13                                          Newtown, PA 18940
                                            Telephone:  (215) 867-2399
14                                          Facsimile:   (267) 685-0676
                                            Email:  medelson@edelson-law.com
15
                                            Joshua Grabar (*pro hac vice* forthcoming)
16                                          **GRABAR LAW OFFICES**
                                            1735 Market St., Suite 3750
17                                          Philidelphia, PA 19103
                                            Telephone:  (267) 507-6085
18                                          Facsimile:   (267) 507-6048
                                            Email:  jgrabar@grabarlaw.com
19

20                                          *Attorneys for Individual and Representative Plaintiffs*
                                            *Denise Redfield and Albert Riccelli*
21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT AND JURY DEMAND